IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FOREVER GREEN | : | CIVIL ACTION |
| ATHLETIC FIELDS, INC., | : | |
|    Putative Debtor/Appellee | : | |
|         v. | : | |
| | : | |
| CHARLES DAWSON, KELLY DAWSON and | : | NO. 14-641 |
| COHEN SEGLIAS PALLAS GREENHALL & | : | |
| FURMAN, | : | |
|    Petitioning Creditors/Appellants | : | |

MEMORANDUM

Dalzell, J.                                                    August 13, 2014

Before us is an appeal from a Bankruptcy Court decision dismissing an involuntary petition based solely on that Court's finding that a petitioning creditor impermissibly used the involuntary petition as a litigation tactic and thus acted in bad faith.

We have jurisdiction to consider this appeal pursuant to 28 U.S.C. §128(a)(1), which provides that the district courts shall have jurisdiction to hear appeals from final judgments, orders and decrees of the Bankruptcy Courts. We draw our recital of the facts from the Bankruptcy Court's decision and the record before that Court and find Judge Coleman's decision to be thorough and well-reasoned. We will therefore affirm.

I.      **Factual Background**

On April 20, 2012, Charles Dawson, his wife Kelli L. Dawson, and the law firm Cohen, Seglias, Pallas, Greenhall & Furman, PC (collectively, the "Petitioning Creditors") filed an involuntary petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101 et seq., against Forever Green Athletic Fields, Inc. ("Forever Green" or the "Putative Debtor"). In re Forever Green Athletic Fields, Inc., 500 B.R. 413, 416 (Bankr. E.D.Pa. 2013). Forever Green's principal

business was marketing artificial turf for athletic fields.  Id. at 419.  The Dawsons have a

$306,006.24 Consent Judgment against Forever Green dated April 5, 2011 as a result of

litigation in Louisiana.  Record on Appeal ("ROA") # 13 (FGAF MTD, Ex. 1).  Cohen, Seglias

has a $206,126.00 judgment against Forever Green entered by the Court of Common Pleas of

Philadelphia County, about which the Bankruptcy Court stated "[n]o additional information has

been provided."  Forever Green, 500 B.R. at 420.

On November 1, 2013, after a two-day hearing and the parties' post-hearing briefing,

Judge Magdeline D. Coleman of the United States Bankruptcy Court for the Eastern District of

Pennsylvania found by a preponderance of the evidence that Charles Dawson filed the

involuntary petition "in furtherance of an improper bankruptcy purpose."  Id. at 430 (citing In re

K.P. Enterprise, 135 B.R. 174, 179 (Bankr. D.Me. 1992)).  She held that the record showed the

litigation to be the "latest tactic employed by Mr. Dawson to frustrate Forever Green's attempts

to litigate its claims against him and the entities he owns," id. at 430-31.  The Court held that

"[a]fter due deliberation and for sufficient cause[,] . . . Mr. Dawson was not motivated by a

proper bankruptcy purpose," id. at 416, and granted the Putative Debtor's motion to dismiss on

the grounds that the involuntary petition was a bad-faith filing and an abuse of the bankruptcy

court system.  Id. at 415, 430.  This appeal ensued.

A.      The Parties

Forever Green is a Pennsylvania corporation whose sole officer and director is Keith

Day.  Id. at 419.  Although Day testified in the Bankruptcy Court hearing that Forever Green was

still operating and that he was trying to restart the business, Hearing Transcript ("Tr.") 1/15/13 at

59:23 and 60:2, the parties stipulated that Forever Green had suspended active business

2

operations in 2010 and was not paying its debts as they came due at the time of the involuntary

filing.  Joint Stip. at ¶¶ 25, 26.  The parties do not dispute that the Petitioning Creditors hold

bona fide claims.  Forever Green, 500 B.R. at 418.

During the two-day Bankruptcy Court hearing, Day testified that Forever Green's current

assets exceeded $6,000,000 -- ($5,000,000 of which represented Forever Green's claim against

Charles Dawson and other current and past co-owners of ProGreen Sports Surfaces, LLC, also a

marketer of synthetic turf (collectively, the "ProGreen parties")).  Tr. 1/15/13 at 14:1, 14:7-

15:23.  See also Forever Green, 500 B.R. at 419.  Forever Green's other assets include a

malpractice claim against its lawyer, Stephen Babcock, in connection with litigation in Louisiana

against Charles Dawson and his wife, which Day valued at $1,000,000 and Babcock offered to

settle for $100,000.  Tr. 1/15/13 at 52:10-12.  See id.  There was little evidence presented of

other Forever Green business activity.   See id. (noting Forever Green's operating account

showed no activity during 2012).  Its bank account balance barely exceed thirty dollars during

the course of the previous year.  ROA # 43.

On the other side of the balance sheet, Day testified that Forever Green's liabilities

totalled approximately $2,300,000.  Tr. 1/15/13 at 52:20-23.  The largest creditor is M & T Bank

(as successor to Wilmington Trust of Pennsylvania) to whom Forever Green currently owes

about $1,300,000 arising from a business line of credit.  Id.  The record indicates that

Wilmington Trust secured its claim with a lien on all Forever Green assets inclusive of its claims

against the ProGreen parties and Babcock.  Forever Green, 500 B.R. at 419.   The parties agreed,

prior to the filing of the involuntary petition, that Wilmington Trust's claim is senior to the

Dawsons' claims, as evinced by a UCC financing statement.[1]  <u>See</u> Joint Stip., ROA # 18.  <u>See</u> <u>also</u> Tr. 2/11/13 at 35:12-22.

Charles Dawson was a former Forever Green salesman turned competitor.  Tr. 1/15/13 at 10:6.  In 2006, he became a member of ProGreen Sports Surfaces, LLC, which had two other members.  <u>See</u> <u>Forever Green</u>, 500 B.R at 420; <u>see</u> <u>also</u> Dawson Depo., 1/5/12 at 88:11-89:4.  At the time the Petitioning Creditors filed the involuntary petition, he had become a 50% member. Tr. 1/15/13 at 8:1, 9:6 and 13:22-23.  <u>See also</u> Dawson Depo., 1/5/12 at 93:8-18.   The record before the Bankruptcy Court did not explain the interplay between Dawson's role at ProGreen and Forever Green's claims against that entity.  But Judge Coleman nonetheless pointedly observed that "it is clear that Mr. Dawson, as an owner of one of the entities sued by Forever Green, has fairly sizeable financial interest in the outcome of these claims."   <u>Forever Green</u>, 500 B.R at 420.

B.    <u>The Prior Litigation</u>

The bankruptcy appeal before us turns on whether the Petitioning Creditors filed the involuntary petition in bad faith to frustrate Forever Green's litigation against the Dawsons and others.  <u>Id.</u> at 416.  But context is all:  the present litigation is the latest chapter in a decade-long Dickensian saga between the parties.  Tr. 1/15/13 at 8:1 and 9:6.

As Judge Coleman observed, the involuntary petition may be traced to June 9, 2005, when Forever Green filed suit in the Bucks County Court of Common Pleas against the

---

[1] <u>See</u> <u>also</u> ROA # 9 (Notice of Removal), Ex. L (May 10, 2011 letter from counsel to Wilmington Trust FSB to counsel for Charles Dawson), stating <u>inter</u> <u>alia</u>:  "Please be advised that the Bank's security interest in all of [Forever Green]'s assets is prior and superior to the rights and interests of your clients, judgment creditors Charles C. Dawson and Kelli L. Dawson. Please be guided accordingly."

ProGreen parties and others. <u>Forever Green</u>, 500 B.R at 420-21. Seeking damages in excess of $5,000,000 arising from the alleged diversion of corporate assets and opportunities, Forever Green alleged in that lawsuit that Charles Dawson "played a central role in the purported scheme and used his position as a sales representative of Forever Green to divert corporate assets from Forever Green to ProGreen." <u>Id.</u> at 421. <u>See</u> also Tr. 1/15/13 14:7-16:9. In July of 2005 the action was removed to this Court. <u>See</u> <u>Forever Green Athletic Fields, Inc. v. ProGreen Surfaces, Inc. et al.</u>, Civil No. 05-3519.

At about the same time, the Dawsons filed suit against Forever Green in Louisiana, seeking unpaid commissions they alleged Forever Green owed Charles Dawson and unpaid wages it allegedly owed to his wife. <u>Forever Green</u>, 500 B.R at 421. On March 2, 2011, a Consent Judgment was entered by the 19th Judicial District Court, Parish of East Baton Rouge, Louisiana in the case captioned <u>Charles C. Dawson and Kelli L. Dawson v. Forever Green Athletic Fields, Inc., David Ripka and Keith Day</u>, Civil No. 547,844, Sec. 26, resolving the main claims between the parties.[2] Under the Consent Judgment, judgment was entered against Forever Green and for Charles Dawson and Kelli Dawson for $306,006.24, including interest and costs. <u>Forever Green</u>, 500 B.R at 421.

While the Louisiana litigation was running its course, the District Court proceeding in Pennsylvania had been suspended in favor of binding arbitration. <u>Id.</u> Under the April 1, 2008 Binding Arbitration Agreement ("Arbitration agreement") between the parties to the District Court litigation -- Forever Green, Day and another individual on the one hand and Charles

---

[2] On June 30, 2011, the Louisiana Court dismissed the Dawsons' remaining personal claims against Day and another individual as untimely. <u>See</u> ROA # 9 (Notice of Removal), Ex. T. (Written Reason for Judgment, dismissing remaining claims in that suit).

Dawson and the other ProGreen parties on the other -- the parties agreed to resolve all their disputes except for those pending in Louisiana.  ROA # 13, Ex. 7 at 1.  The parties agreed to appoint Howard D. Venzie, Jr., Esq. of the law firm Venzie, Phillips & Warshawer, P.C., as arbitrator.  Id. at 2.  Judge Coleman noted that the Arbitration agreement also provided:

> Cooperation.  The parties hereto agree to cooperate and assist in the implementation of this Agreement, and hereby agree to execute any and all documents necessary to effectuate their Agreement hereunder.

Forever Green, 500 B.R at 422 (citing Arbitration agreement ¶16).

On March 30, 2011, less than one month after the entry of the Consent Judgment, the ProGreen parties submitted a motion to terminate arbitration with Mr. Venzie.  ROA # 13, Ex. 9.  The ProGreen parties contended that their motion should be granted because Forever Green was insolvent -- neither it nor Day and his colleague "have the ability or desire to pay" the arbitration fees, and the Forever Green parties had repeatedly failed to provide current financial information and other disclosures.  Id. at 2, 9.  The motion to terminate listed $498,292.00 in federal and state tax liens against Forever Green in addition to Wilmington Trust's $1,350,000 claim.[3]  Id. at 10,

---

[3] 11 U.S.C. § 724 (b), governing the treatment of certain liens, establishes lien priority such that: Property in which the estate has an interest and that is subject to a lien that is not avoidable under this title . . . shall be distributed—

> (1) first, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is senior to such tax lien;
> (2) second, to any holder of a claim [for certain administrative expenses and specified priority claims]. . .;
> (3) third, to the holder of such tax lien, to any extent that such holder's allowed tax claim that is secured by such tax lien exceeds any amount distributed under paragraph (2) of this subsection;
> (4) fourth, to any holder of an allowed claim secured by a lien on such property that is not avoidable under this title and that is junior to such tax lien;
> (5) fifth, to the holder of such tax lien, to the extent that such holder's allowed claim secured by such tax lien is not paid under paragraph (3) of this subsection; and

12.  It also listed judgments recorded against Forever Green, including the $206,126.00 judgment of Cohen, Seglias recorded on December 29, 2010 and the Dawsons' $306,006.24 Consent Judgment.  Id. at 11.  The motion made clear that any judgment creditors -- including the Dawsons -- might serve a writ of execution on the arbitrator as garnishee, thereby preventing the arbitrator from paying any of Forever Green's debts or disposing of its property.  Id. at 15.

Over the next few weeks, the Dawsons took steps to do just that.  On April 26, 2011, they recorded their Louisiana judgment, by then $326,610.07 with interest, in the Court of Common Pleas of Philadelphia County.[4]  ROA # 13, Ex. 2 at 2.  At the same time, their counsel advised the arbitrator that they would be seeking to garnish "any [Forever Green] funds in [his] or [his] firm's possession," at that time consisting only of a $5,081.82 advance deposit on the arbitrator's fees.  ROA # 13, Ex. 11 at 1.  The arbitrator informed the parties the following day that the Dawsons' demand placed him "in a position of being adverse to the parties . . . and to . . . the Dawsons who are related to the subject matter of this arbitration and have an interest in the outcome."  Id.  Concluding that the demand "create[d] ethical implications regarding impartiality" and put payment for his services at risk, the arbitrator suspended the proceedings indefinitely.  Id. at 1-2.  The next day, "knowing that their action would cause the suspension of the arbitration," Forever Green, 500 B.R. at 423, the Dawsons obtained a writ of execution against the arbitrator and his law firm.  Id.

---

(6) sixth, to the estate.
The Dawsons' motion to terminate lists $1,848,292 in claims against Forever Green senior to their Consent Judgment.

[4] The Dawsons subsequently also recorded the Consent Judgment in New Jersey, although Forever Green had no known assets there.  Dawson Depo., 1/5/12 at 211:18-212:5.  In his hearing testimony, Day stated without objection that the Dawsons intended to attach funds held by Forever Green's New Jersey-based attorney.  Tr. 1/15/13 at 27:21-28:8.

Charles Dawson explained his strategy during his deposition.

[Plaintiffs' attorney:]  At this point, after obtaining the judgment, what was your intention as to what to do with it?
[Dawson:]                Get paid.
[Plaintiffs' attorney:]  And how did you propose to get paid?
[Dawson:]                Find any available asset that Forever Green may have and try to use the lien to seize it.

. . .

[Plaintiffs' attorney:]  Okay.  And this is generally what you wanted [your attorney] to do, is to make the arbitration stop?
[Dawson:]                Of course.
[Plaintiffs' attorney:]  Okay.   And the reason was?
[Dawson:]                I don't believe it has any merit and I'm sick of paying attorneys. I am for compromise and no one else is.  That's why.

. . .

[Plaintiffs' attorney:]  Okay.   Were you aware that one of the reasons set forth or that would be used to try to terminate this proceeding was the fact that the Dawson judgment now being transferred to Pennsylvania would be used to levy on any monies to be paid to the arbitrator?
[Dawson:]                I'm going to use that judgment to levy any monies I can find anywhere, whether it be the arbitrator or anyone else.  So, yeah, if we can get the lien paid, that's my number one objective. If I can get it paid, I'm very happy.

Dawson Depo., 1/5/12 at 181:3-10, 186:17-24, 187:15-188:1

The Forever Green parties responded by filing a complaint in the Court of Common Pleas

of Philadelphia County against the Dawsons and others seeking a declaratory judgment and other

equitable relief.  Forever Green, 500 B.R. at 423.

While that Philadelphia action was pending, in November of 2011 the Dawsons'

Louisiana counsel wrote to a Forever Green attorney proposing a global settlement under which

Charles Dawson would offer testimony helpful to Forever Green in its prosecution of its

Louisiana malpractice claim if the Consent Judgment were paid off.  Id.; see also ROA # 13, Ex.

14.  In addition, the Dawsons would grant Forever Green a full discharge of their claim if it obtained a release of personal guaranties by two other ProGreen parties from Wilmington Trust. Id.  The Dawsons' counsel wrote that the arbitration was in an "indefinite state of suspension" and "[u]nless and until the Dawsons' Judgment for about $300,000.00 is paid off in full, that indefinite state of suspension will continue."  ROA # 13, Ex. 14 at 1.  The settlement attempt failed.  Forever Green, 500 B.R. at 423.

On March 6, 2012, the court in the Philadelphia action issued a scheduling order in anticipation of a final order that would declare whether the payments made to the arbitrator inclusive of the advance deposit were immune from garnishment and free of all claims by the Dawsons.  Id. at 424.  The scheduling order required (1) a joint stipulation of facts by March 30, 2012; (2) the Forever Green parties' memorandum of law in support for their request for declaratory relief by April 18, 2012; and (3) by May 3, 2012, the defendants' memorandum of law in opposition to plaintiffs' request for declaratory relief.  Id.

On March 30, 2012, the parties filed the joint stipulation and on April 18, 2012, the plaintiffs filed their memorandum.  Id.  But the defendants failed to file their response.  Instead, on April 20, 2012, the Petitioning Creditors filed the involuntary petition against Forever Green and simultaneously filed a suggestion of bankruptcy in the Philadelphia action.  Id.  The Court of Common Pleas responded by placing the action in deferred status.[5]  Id.  On May 14, 2012, the

_____

[5] The Forever Green parties sought unsuccessfully to contest the Philadelphia court's decision. In re Forever Green, 500 B.R. at 424.  They contended the Philadelphia action need not have been placed in deferred status as a suggestion of bankruptcy only operates as a stay of proceedings against the debtor pursuant to 11 U.S.C. §362(a).  A suggestion of bankruptcy operates as a stay only of proceedings against a debtor, not where the debtor is the plaintiff.  See Maritime Electric Co. v. United Jersey Bank, 959 F.2d 1194, 1205 (3d Cir. 1991).

9

Dawsons removed the Philadelphia action to the Bankruptcy Court for the Eastern District of Pennsylvania. Id.; see also ROA # 9 at 1.

## II.    **Procedural Background**

### A.    Procedural History

The procedural history in the Bankruptcy Court is no less tangled than the prior litigation. On April 23, 2012, the Petitioning Creditors filed an amended petition, and on June 1, 2012 the court filed an Order of Relief granting relief under Chapter 7 of the Bankruptcy Code by judgment of default. Forever Green, 500 B.R. at 416-17. On June 21, 2012, Forever Green filed a motion to vacate the Order of Relief, arguing that the Court lacked jurisdiction to enter the Order because the Petitioning Creditors had never properly served the summons and complaint: the Petitioning Creditors' proof of service failed to identify an officer, a managing or general agent, or any other agent authorized to receive service of process pursuant to Rule 4(h).[6] Id. at 417. The Bankruptcy Court held that personal jurisdiction over Forever Green had not been established and on September 7, 2012 Judge Coleman vacated the Order of Relief and ordered the Petitioning Creditors to effect service of the involuntary petition in accordance with the procedures set forth in Fed. R. Bankr. P. 1010. Id.

On October 9, 2012, the Petitioning Creditors filed a certificate of service certifying the petition had been mailed to Day. Id. On October 26, 2012, Forever Green filed its motion to

---

[6] Fed. R. Civ. P. 4(h)(1)(B) provides that service on a corporation may be effected "by delivering a copy of the summons and of the complaint to an officer, a managing or general agent, or any other agent authorized by appointment or by law to receive service of process and—if the agent is one authorized by statute and the statute so requires—by also mailing a copy of each to the defendant[.]"

10

dismiss, contending that service of process was again insufficient[7] and that the petition should be dismissed because it was filed in bad faith.  Id.  On January 15 and February 11, 2013, the Bankruptcy Court held evidentiary hearings on the motion to dismiss, at which Forever Green's officer and director, Day, was the only witness.  Id. at 418.  Day testified that Forever Green had not been depleting its assets.  Tr. 1/15/13 at 53:19-20.  He further stated that he had been personally funding the litigation and had paid down trade claims and tax from his own funds.  Id. at 55:9-56:24.  Day also testified that he decided to pay off with his own funds "[t]hose [debts] that [he] had financial personal guarantees on."  Tr. 2/11/13 at 22:1-5.  Asked whether he had paid the Dawsons anything, Day answered, "There are other creditors ahead of them," among them Wilmington Trust, holder of a filed lien.  Day explained that Wilmington Trust is "a secured creditor ahead of all unsecured creditors."  Id. at 35:12, 20-21.

At the close of the hearings the parties briefed Judge Coleman as to whether the Court should "dismiss the [i]nvoluntary [p]etition as being filed in bad faith because Mr. Dawson invoked [the] Court's jurisdiction for an improper purpose."  Forever Green, 500 B.R. at 418. The Petitioning Creditors continued to argue that Mr. Dawson's status as a judgment creditor "inoculates him from any imputation of bad faith."  Id. at 424.

---

[7] Forever Green waived this issue.  See Forever Green, 500 B.R. at 418 n.3.  Nonetheless, Judge Coleman concluded that "this Court doubts whether the procedure followed by the Petitioning Creditors comports with applicable rules."  Id.  The Petitioning Creditors filed a Praecipe to Re-Issue summons after Forever Green filed its motion to dismiss.  Id. at 417.  They then filed a certificate of service on November 7, 2012, which again failed to identify the person on whom the summons was served, and another on November 9, 2012, which failed to state Day's address.  Id. at 417-18.  On November 15, 2012, the Petitioning Creditors filed a third certificate of service indicating service on Day at the Forever Green corporate address on November 9, 2012.  Id. at 418.  But, as Judge Coleman noted, Fed. R. Civ. P. 4(m) requires that service of summons and complaint occur within 120 days, a rule which "empower[s] [the] court to dismiss [an] involuntary petition not served within 120 days."  Id. at 418 n. 3.  The 120-day period expired in October of 2012.

B.     The Decision Below

On November 1, 2013, Judge Coleman issued her decision dismissing the involuntary petition, finding that "[t]he record before this Court demonstrates that Mr. Dawson effectuated the filing of the [i]nvoluntary [p]etition in furtherance of his pre-existing scheme to frustrate the prosecution of a pending arbitration proceeding as well as to force Forever Green to pay Mr. Dawson's claim ahead of Forever Green's other creditors." Id. at 416.  In her decision, Judge Coleman found that the fact that Dawson is a bona fide creditor "does not establish that he invoked [the Bankruptcy] Court's jurisdiction for a proper bankruptcy purpose." Id. at 424. Rather, "bad faith may be imputed to a bona fide creditor when that creditor has filed an involuntary petition for a non-bankruptcy purpose." Id.

Judge Coleman reviewed the threshold requirement that a petitioner possess a "valid bankruptcy purpose." Id. at 425.  To that end, she outlined the different goals of involuntary and voluntary petitions. Id.  In particular, she distinguished involuntary Chapter 7 petitions -- which "prevent a debtor from choosing to pay certain creditors over other similarly situated creditors" -- from voluntary Chapter 7 petitions whose "purpose is to prevent the collection efforts of certain creditors from gaining an advantage over less diligent creditors." Id.  She also surveyed the tests Circuit Courts use to determine a petitioner's true intent. Id. at 425-26.  Adopting the totality of the circumstances test that our Court of Appeals held applies for voluntary petitions, Judge Coleman found that Forever Green had rebutted the Petitioning Creditors' presumption of good faith by a preponderance of the evidence. Id. at 426.  She considered the Putative Debtor's allegations that Charles Dawson had filed the involuntary petition to frustrate its efforts to litigate its claims against the ProGreen parties and force Day to pay, on behalf of Forever Green,

the amounts due to the Dawsons pursuant to the Consent Judgment.  Id. at 426-27.  "Both, if

supported by the record, would be sufficient to impute bad faith to Mr. Dawson."  Id. at 427.

Judge Coleman found that the evidence showed that the involuntary petition was part of

Dawson's larger strategy to pressure Forever Green.  Id. at 427.  She noted, inter alia, his

admission that he transferred the Consent Judgment to Pennsylvania and executed it knowing it

would trigger a suspension of the arbitration, with the intent of forcing payment of that

judgment.  Id. at 427-28.

> By causing the suspension of the arbitration and refusing to allow
> it to proceed unless he was paid on the Consent Judgment,
> [Dawson] put his personal interests ahead of Forever Green's other
> creditors.  [He] prevented Forever Green from collecting its largest
> asset and divested Forever Green of its only means of paying its
> other, higher-priority claims.

Id. at 428.  Judge Coleman also considered the timing of the petition -- one week before the

answer was due in the Philadelphia action.  Id.   At the same time, she found the Petitioning

Creditors' "lack of diligence" in effecting service further evidence that this filing was not "the

product of due diligence and sober decision making."  Id. at 428-29 (quoting In re Express Car &

Truck Rental, Inc., 440 B.R. 422, 434 (Bankr. E.D.Pa. 2010)).

She also found unpersuasive the Petitioning Creditors' repeated insistence on the validity

of their claim, which she attributed to their "failure. . . to understand the bad faith issue. . . .

[T]his argument improperly conflates the bona fide creditor inquiry with the bad faith inquiry."

Id. at 429.  Even a creditor with a bona fide claim must meet the standard for an involuntary

petition, that is, must have a reason to believe that the creditors' collective interests "would

benefit from the invocation of bankruptcy relief," she held.  Id.  Finally, she found no support for

the Petitioning Creditors' contention that they filed the involuntary petition to prevent the

13

dissipation of Forever Green's assets because they "only cite [its] prosecution of its claims against the ProGreen [p]arties as evidence of Forever Green's dissipation of assets," -- litigation that Day testified he was funding with his personal assets.  Id.  "Even if Forever Green was funding the litigation," Judge Coleman held, "this Court has difficulty crediting the notion that the pursuit of Forever Green's only asset that may yield a meaningful recovery to its creditors can be characterized as a dissipation of estate assets."  Id. at 429-30.  Judge Coleman concluded that, regardless of Charles Dawson's actions prior to the involuntary petition, she could identify no valid bankruptcy purpose to the petition because Forever Green has no assets besides its potential litigation recovery and therefore no assets that could be liquidated.  Id. at 430.

"From this Court's review of the evidentiary record, this Court finds no basis to infer that the filing of the [i]nvoluntary [p]etition was motivated by a proper purpose."  Id.

The Bankruptcy Court stayed its consideration of Forever Green's request for attorney fees pursuant to 11 U.S.C. §303(i) pending this appeal.

## III.   Legal Standard

We exercise appellate jurisdiction over final judgments, orders and decrees entered by bankruptcy courts pursuant to 28 U.S.C. § 158(a)(1).  Federal Rule of Bankruptcy Procedure 8013 provides that a reviewing court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013.  In our review, we are governed by traditional standards of appellate review and accordingly review a bankruptcy court's legal determinations de novo, independent of that court and without deference to its analysis and conclusions of law.  See American Flint Glass Workers Union v. Anchor Resolution Corp., 197 F.3d 76, 80 (3d Cir. 1999); see also Fed. R. Bankr. P.

14

8013.  We review its factual findings, whether based on oral or documentary evidence, for clear error, and its exercise of discretion for abuse thereof.  In re Trans World Airlines, Inc., 145 F.3d 124, 130-31 (3d Cir. 1998).  Mixed questions of fact and law must be broken down and reviewed under the applicable standard.  See In re Montgomery Ward Holding Corp., 326 F.3d 383, 387 (3d Cir. 2003).  We review a bankruptcy court's dismissal of a bankruptcy case as a bad faith filing for abuse of discretion.  In re SGL Carbon Corp., 200 F.3d 154, 159 (3d Cir. 1999).

A factual finding is clearly erroneous if the district court is firmly convinced, based on all of the evidence, that the bankruptcy court made a mistake.  See Fed. R. Bankr. P. 8013 Advisory Committee's Note.  We may not engage in independent factfinding but must give due regard to a bankruptcy judge's opportunity to observe the demeanor and credibility of witnesses.  See In re Indian Palms Assocs., Ltd., 61 F.3d 197, 210 n.19 (3d Cir. 1995) (citing 28 U.S.C. §158(a)); see also Fed. R. Bankr. P. 8013.

The petitioner bears the burden to show it has acted in good faith.  In re Tamecki, 229 F.3d 205, 207 (3d Cir. 2000) ( "Once a party calls into question a petitioner's good faith, the burden shifts to the petitioner to prove his good faith.") .

## IV.    Discussion

### A.    Scope of Review

As a threshold matter, we must determine the actual scope of our review.  Appellants present thirty issues for review:

1. Did the Bankruptcy Court err in dismissing the involuntary bankruptcy petition?
2. Did the Bankruptcy Court err in failing to grant the involuntary bankruptcy petition?
3. Did the Bankruptcy Court fail to honor the sanctity of the petitioning judgment creditors' judgments in violation of the Rooker-Feldman doctrine?
4. Did the Bankruptcy Court err in failing to recognize that there was NO pending

litigation regarding Mr. Dawson's judgment as it was a final judgment not subject to any type of review by the Courts?

5.  Did the Bankruptcy Court err in finding Mr. Dawson, a judgment creditor, acted in bad faith in pursuing his <u>bona fide</u> judgment subject to protection under the Rooker-Feldman doctrine?

6.  Did the Bankruptcy Court err in failing to recognize creditor's [sic] legal right to seek enforcement of a <u>bona fide</u> judgment?

7.  Did the Bankruptcy Court err in considering the arbitration proceeding involving matters wholly unrelated to the underlying petitioning judgment creditors' claims?

8.  Did the Bankruptcy Court err in dismissing the involuntary petition when there were three petitioning creditors when[] there was no defense that any more than one was necessary?

9.  Did the Bankruptcy Court err in failing to grant the involuntary bankruptcy petition by failing to recognize the other two unchallenged petitioning judgment creditors?

10. Did the Bankruptcy Court err in failing to rule in favor of the petitioning judgment creditors['] request for the opportunity to seek and obtain additional creditor (or creditors) to join into the petition?

11. Did the Bankruptcy Court err in stating that Debtor alleged that Petitioning Creditors acted in bad faith, when Debtor only alleged that one judgment creditor acted in bad faith?

12. Did the Bankruptcy Court err in considering any issues beyond "bad faith" of one of the three petitioning judgment creditors, the only issue presented in the motion to dismiss?

13. Did the Bankruptcy Court err in holding that a petitioning judgment creditor can act in bad faith where all criteria of an involuntarily [sic] bankruptcy petition have been satisfied or otherwise established (including admitted by Debtor)?

14. Did the Bankruptcy Court err in commingling the judgment claim of Charles Dawson with the Debtor's claims against different entities?

15. Did the Bankruptcy Court err in suggesting or otherwise holding that a judgment creditor's attempts to enforce or collect a judgment are indications of bad faith in an involuntary petition?

16. Did the Bankruptcy Court err in applying the totality of the circumstances in making its determination?

17. Did the Bankruptcy Court err in reviewing or otherwise commenting on service, which was waived?

18. Did the Bankruptcy Court err by discounting the validity of the petitioning creditor's judgment by referencing the Debtor, "was essentially judgment proof" and then later ignoring the claim by Debtor of being judgment proof in determining the appropriateness of an involuntary petition?

19. Did the Bankruptcy Court err in making factual determinations that where [sic] irrelevant to the matters before the Court (and for issues not before the Court)?

20. Did the Bankruptcy Court err in considering a disputed, contingent claim of the

debtor, which claim had almost no value according to the books and records of the debtor, as having any bearing on the rights of a <u>bona</u> <u>fide</u> judgment creditor in seeking an orderly dissolution of the debtor by way of an involuntary petition?

21.  Did the Bankruptcy Court err in failing to recognize that Debtor was collecting receivables but only made payments to select creditors (specifically those in which its principal also had personal liability)?

22.  Where the Bankruptcy Court held that Forever Green essentially had no current active purpose, did the Court err in failing to rule that marshalling of debtor's assets for the benefit of creditors was not a valid purpose in the instant involuntary petition?

23.  Did the Bankruptcy Court err in failing to recognize that the bankruptcy proceeding would be a much more effective way to marshall [sic] the assets of an entity that had been defunct for almost two years?

24.  Did the Bankruptcy Court err in failing to recognize that the filing of the involuntary petition did not prevent Debtor (or a trustee) from pursuing the claims of Debtor?

25.  Did the Bankruptcy Court err in finding that the filing of an involuntary bankruptcy petition was an attempt to preference one of the petitioning judgment creditors over all other creditors?

26.  Did the Bankruptcy Court err in finding that a petitioning judgment creditor could somehow obtain preferential treatment in an involuntary filing?

27.  Did the Bankruptcy Court err in failing to recognize a judgment creditor's right to request an orderly dissolution of Debtor in order to obtain a proportionate share of Debtor's assets?

28.  Did the Bankruptcy Court err in failing to recognize a judgment creditor's right to request an orderly dissolution of Debtor in order to prevent preferential conduct of the Debtor?

29.  Did the Bankruptcy Court err in failing to appoint a trustee to examine the assets and claims belonging to Debtor in order to proportionately satisfy the claims of creditors?

30.  Did the Bankruptcy Court err in failing to appoint a trustee to determine any preferential payments made by the debtor to creditors?

Appellant Br. at 6-9.[8]

Bankruptcy Rule 8010 requires that all appellate briefs filed in the district court contain

"a statement of the issues presented and the applicable standard of appellate review," and that the

---

[8] Appellants also refer to further Bankruptcy Court proceedings after Forever Green's motion to dismiss was granted.  Appellant Br. at 11.  Matters post-dating the appealed decision are not before us.

argument section set forth "the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statutes and parts of the record relied on." Bankruptcy Rule 8010(a)(1)(C),(E). This rule was modelled on Rule 28 of the Federal Rules of Appellate Procedure. <u>Trans World Airlines, Inc.</u>, 145 F.3d at 132. As such, Rule 8010 is not "only a technical or aesthetic provision," but rather "has a substantive function -- that of providing the other parties and the court with some indication of which flaws in the appealed order or decision motivate the appeal." <u>Id.</u> (internal citation omitted).

Our Court of Appeals teaches that "[w]hen the district courts are sitting on appeal, they are entitled to the same full exposition of the parties' contentions that we have repeatedly insisted on for ourselves." <u>Id.</u> at 133 (citing cases). Accordingly, "a district court may, in its discretion, deem an argument waived if it is not presented in accordance with Rule 8010." <u>Id.</u> at 132.

We note at the outset that appellants list thirty issues for review but that they failed to match many of those issues to arguments with citations to the authorities as the Rule requires. For a number of the issues presented, appellants dispensed with citations to authorities altogether -- as when they contested the Bankruptcy Court's consideration of the parties' litigation history, <u>see</u>, <u>e.g.</u>, nos. 7, 12 and 19 -- but cited no case law or statutes in support of their contention that the Bankruptcy Court had erred. <u>See</u> Appellant Br. at 33-34. Similarly, appellants offered neither facts nor law to support their assertion that the Bankruptcy Court erred when it "commingl[ed]" Dawson's judgment claim with Forever Green's claims against others (issue no. 14). Nor do they address why they believe the Bankruptcy Court erred when it discussed the ProGreen parties' repeated failures to effect good service as evidence of Dawson's bad faith, even though Forever Green waived the service issue at the hearing. <u>See</u> no. 17.

18

Likewise, they contest a number of the Court's factual findings -- that Forever Green was "essentially judgment proof" (no. 18), that its sole officer was collecting receivables and selectively paying off debts[9] (no. 21) and that Forever Green's arbitration claim against the ProGreen parties had a bearing on Dawson's right to file the involuntary petition (no. 20) -- arguing that they were "irrelevant," (no. 19).  In their Reply brief, appellants argue again (and again without citation to authority) that the Bankruptcy Court's factual findings concerning the prior litigation are irrelevant because Charles Dawson is but one of nine parties to the aborted arbitration, Reply Br. at 5,6.  They also claim that the Court "exceeded its authority by making findings beyond the scope of the motion to dismiss and beyond its authority," id. at 12, pointing as an example to the Court's characterization of Forever Green as essentially judgment proof. Such descriptions, they contend, "belittle the claims."  Id. at 13.

These contentions all lack merit.  First, as to the Rule 8010 requirements, appellants failed to cite any authority for challenging the Bankruptcy Court's reliance on those filings or its findings from the record, nor do they point out the Court's clear error from citations to the record.  It bears noting that the parties themselves put the prior litigation before the Bankruptcy Court and this Court through their filings, court testimony and depositions -- indeed, they stipulated to many facts concerning the original action, the Louisiana action and the course of arbitration proceedings.  ROA # 18 at 6-15.  See also In re Piazza, 719 F.3d 1253, 1273 n.10 (11th Cir. 2013).  We deem issue nos. 7, 12, 14, 17, 18, 19, 20 and 21, waived pursuant to Rule 8010.

---

[9] Day testified that he was using his own funds to pay those debts for which he was a personal guarantor.  See Tr. 2/11/13 at 22:1-5.  He also testified that there were accounts receivable, Tr. 1/15/13 at 16:6, but the bank accounts entered into the record showed no deposits.  ROA # 13.

Similarly, appellants claim that the Bankruptcy Court failed to recognize the validity of the other petitioning creditors' judgments (no. 9) and failed to recognize a creditor's right to seek enforcement of a <u>bona</u> <u>fide</u> judgment (no. 6).  We deem issue no. 9 waived as appellants failed to address it as Rule 8010 requires.  As to issue no. 6, this contention is contradicted by the record, as the Bankruptcy Court explicitly recognized the validity of the Dawsons' Consent Judgment. Judge Coleman stated, "All parties concede that each of the Petitioning Creditors holds <u>bona</u> <u>fide</u> claims against Forever Green."  <u>Forever Green</u>, 500 B.R. at 416.

Further, any issue not raised in the Bankruptcy Court is deemed waived and we may not consider it on appeal.  <u>See</u> <u>Belcufine v. Aloe</u>, 112 F.3d 633, 638 (3d Cir. 1997).  Appellants invoked the <u>Rooker-Feldman</u> Doctrine at the outset of the hearing on Forever Green's motion to dismiss.  Tr. 1/15/13 at 6:25-7:2.  But they failed to articulate (either at the hearing or in their post-hearing briefs before the Bankruptcy Court) how that doctrine applies to the Forever Green motion to dismiss the involuntary petition.

Now they seek to raise the <u>Rooker-Feldman</u> Doctrine as an issue on appeal before us (nos. 3, 4 and 5).  To begin with, even if we were to consider appellants' mere incantation of "<u>Rooker-Feldman</u>" at the outset of the Bankruptcy Court hearing to suffice for preserving the issue on appeal, the matter before us clearly falls well outside the confines of this Doctrine.  As our Court of Appeals explained in <u>Saunders v. Philadelphia Dist. Attorney's Office</u>, 546 Fed.Appx. 68 (3d Cir. 2013),

> The Rooker-Feldman doctrine is confined to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." <u>Exxon Mobil Corp. v. Saudi Basic Indus. Corp.</u>, 544 U.S. 280, 284 (2005).  We have set forth four requirements

> that must be met for the Rooker–Feldman doctrine to apply: "(1) the federal plaintiff lost in state court; (2) the plaintiff complains of injuries caused by the state-court judgments; (3) those judgments were rendered before the federal suit was filed; and (4) the plaintiff is inviting the district court to review and reject the state judgments." <u>Great W. Mining & Mineral Co. v Fox Rothschild LLP</u>, 615 F.3d 159, 166 (3d Cir. 2010).

<u>Id.</u> at 72 n. 2.  Since the appellants, as recipients of the Consent Judgment, were the <u>winners</u> in the state-court proceedings, and neither party invites district court review of <u>that</u> judgment, the requirements just outlined are not met.  But as appellants failed to articulate to the Bankruptcy Court how this doctrine applies, we may not and will not now consider the issue on appeal.

Nor can Appellants find support for their argument that the Bankruptcy Court erred in dismissing the petition "when there were three petitioning creditors when[] there was no defense that any more than one was necessary," (no. 8).  Again, because appellants raise this issue for the first time on appeal, we deem it waived.  Consequently, it is not susceptible to review in this Court absent exceptional circumstances, which have not been pled.  <u>See</u> <u>Equibank, N.A. v. Wheeling-Pittsburgh Steel Corp.</u>, 884 F.2d 80, 86 (3d Cir. 1989).  We note, again, that the record does not support appellants' argument in any case.  First, Day testified that Forever Green has "[i]n excess of 50" creditors, Tr. 2.11/13 at 40:14.  Therefore, by statute, three or more unsecured creditors with claims in excess of $15,325 were required for the involuntary petition.  <u>See</u> 11 U.S.C. § 303(b)(1) and (2).  Equally on point, "[a]ll parties concede. . . that a sufficient number[] of creditors have filed the Involuntary Petition."  <u>Forever Green</u>, 500 B.R. at 416.

Appellants' brief also seeks to call into question Day's credibility by reviewing the factual record and his hearing testimony at length.  Appellant Br. at 35-36.  We give due regard to Judge Coleman's opportunity at the hearing to observe Day and determine his credibility with

respect to the issue before her, that is, Forever Green's motion to dismiss.  We will not engage in independent factfinding.

When an appellant fails to set forth the basis for his appeal in a compliant brief, dismissal may be warranted.  In re Shemonsky, 293 Fed. Appx. 110 (3d Cir. 2008).  Consequently, we will dismiss those issues that appellants failed to brief pursuant to Rule 8010 or waived by failing to raise in the Court below.

      B.    Issues on Appeal

Appellants' remaining issues distill to three arguments they support by citations to authorities, statutes and parts of the record as Rule 8010 requires them to do: the Bankruptcy Court erred (1) in dismissing the involuntary petition based upon its finding that a petitioning creditor acted in bad faith, when the petitioning creditors met the statutory criteria for such a filing, (nos. 1, 2, 13, 15, 25 and 26); (2) by dismissing the petition because Charles Dawson alone acted in bad faith when it should have permitted appellants to join other creditors to the petition, (nos. 10, 11, 16); and (3) in failing to appoint a trustee to marshal Forever Green's assets in an orderly dissolution and avoid preferential payments (nos. 22, 23, 24, 27, 28, 29 and 30).

      1.    Whether An Involuntary Petition Conforming
            To Statutory Requirements May Be Dismissed
            On A Finding Of Charles Dawson's Bad Faith

We begin by considering whether appellants met the criteria for an involuntary petition. As we discuss below, this inquiry is intertwined with the question of Dawson's bad faith because our Court of Appeals equates a valid bankruptcy purpose with a good faith filing.  See In re

Integrated Telecom Express, Inc., 384 F.3d 108, 126 (3d Cir. 2004) (deeming an "antecedent" inquiry to be "whether the petition. . .[is] filed in good faith, i.e., whether [it] serve[s] a valid bankruptcy purpose").

Appellants contend that they meet the threshold requirement for commencing an involuntary bankruptcy pursuant to 11 U.S.C. § 303 et seq., which states in relevant part:

> An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title--
>
> (1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $15,325 more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;
>
> (2) if there are fewer than 12 such holders, . . . by one or more of such holders that hold in the aggregate at least $15,325 of such claims;

11 U.S.C. § 303(b)(1) and (2).  See also Appellant Br. at 23-24.  Appellants contend they met the statutory requirement to file an involuntary petition because three separate petitioning creditors (Charles Dawson, Kelli Dawson and Cohen, Seglias) each held a claim that was not contingent and their aggregate claims against Forever Green exceeded the statutory threshold under 11 U.S.C. § 303(b)(1).[10]  Id. at 23.  Appellants argue that the Judgments in their favor are not subject to bona fide dispute.  Id. at 24.

The appellants also contend that filing an involuntary Chapter 7 petition protects their interests relative to other creditors, citing In re Silverman, 230 B.R. 46 (Bankr. D.N.J. 1998), and

---

[10] As it is undisputed that there are more than twelve creditors, provision (2) does not apply.

23

that this constitutes a proper purpose, see General Trading v. Yale Materials Handling Corp., 119 F.3d 1485, 1502 (11th Cir. 1997). They contend that Day's testimony cast doubt on which creditors were paid: "it is certain that a select group of creditors of Forever Green have received hundreds of thousands of dollars to the detriment of the petitioning creditors," Appellant Br. at 27 -- an alleged situation that urges liquidation or reorganization through an involuntary petition. Id. at 28. They assert that, like any other judgment creditor, Charles Dawson "had every right to exert pressure and enforce his rights as a judgment creditor." Id. at 34.

In their reply brief, appellants argue further that the orderly and fair distribution of assets through the involuntary petition was essential because Forever Green was no longer operating yet Day was disbursing assets. Reply at 3-4. Appellants also argue that the involuntary petition cannot be dismissed when three bona fide judgment creditors file in accordance with the 11 U.S.C. § 303(b)(1) statutory requirement. See Reply at 7-9, 11-12.

Appellee Forever Green responds that an involuntary petition must be filed in good faith. Appellee Br. at 22. Forever Green argues that there is a presumption that a petitioning creditor has filed the petition in good faith. Id. at 23, citing In re Mylotte, David & Fitzpatrick, 2007 WL 2033812 (Bankr. E.D.Pa. July 12, 2007). To overcome that presumption, the putative debtor must show that the petition was not filed in good faith by a preponderance of the evidence. Id. Forever Green urges that we apply our Court of Appeals's teaching that an involuntary petition that is not filed in good faith may be dismissed. Id. Forever Green relies on decisions showing that courts have routinely dismissed involuntary petitions for being filed in bad faith -- inter alia, to force settlement or circumvent other forms of dispute resolution, see, e.g., In re Skyworks Ventures, Inc., 431 B.R. 573 (Bankr. D.N.J. 2010), or to affect a contract dispute, see, e.g., Basin

Electric Power Cooperative v. Midwest Processing Co., 47 B.R. 903, 909 (D.N.D. 1984).  Here,

Forever Green contends the involuntary petition was a bad faith filing because it arose from the

Dawsons' efforts to "derail" arbitration in which the Dawsons and other ProGreen parties faced a

$5 million claim.  Appellee Br. at 30.  Forever Green points to the timeline from the Dawsons'

efforts to enforce their Consent Judgment and their motion to terminate arbitration to their

joinder in the involuntary petition after their proposed settlement foundered.  Id. at 30-32.

Forever Green argues "the record affirmatively shows that Mr. Dawson filed the [i]nvoluntary

[p]etition at issue here to put himself in a more advantageous position with respect to the contract

dispute claims."  Id. at 33.

      A bankruptcy petition must have a valid bankruptcy purpose, whether the filing seeks an

entity's reorganization or liquidation.  See Integrated Telecom, 384 F.3d at 120 n. 4.  The

Supreme Court has identified the two valid purposes as (1) "preserving going concerns" and (2)

"maximizing property available to satisfy creditors."  Bank of Am. Nat'l Trust & Sav. Ass'n v.

203 N. LaSalle P'ship, 526 U.S. 434, 435 (1999).  As our Court of Appeals has held, "courts

have required . . . petitioners to act within the scope of the bankruptcy laws to further a valid

reorganizational purpose."  SGL Carbon Corp., 200 F.3d at 165.  Here, where the parties agree

that Forever Green suspended active business in 2010 and has not been paying its debts as they

come due, Joint Stip. at ¶¶ 25, 26, the only valid bankruptcy purpose can be to maximize the

property available to creditors.  See In re Better Care, Ltd., 97 B.R. 405, 410-11 (Bankr. N.D.Ill.

1989).

      But that conclusion, on which appellants urge us to rest a finding that their petition

should not have been dismissed, does not end our inquiry into a valid bankruptcy purpose.  See

Integrated Telecom, 384 F.3 at 129.  Involuntary and voluntary bankruptcy petitions -- whether seeking Chapter 11 reorganization, Chapter 7 or Chapter 13 -- are subject to dismissal if filed in bad faith.  Id. at 118.   See Landon v. Hunt, 977 F.2d 829 (3d Cir. 1992) (involuntary petition dismissed as filed in bad faith); see also Tamecki, 229 F.3d 205 (3d. Cir. 2000) (dismissing Chapter 7  petition filed in bad faith); SGL Carbon, 200 F.3d 154 (dismissing Chapter 11 petition filed in bad faith); In re Lilley, 91 F.3d 491 (3d Cir. 1996) (dismissing Chapter 13 petition filed in bad faith).  As our Court of Appeals teaches, the good faith requirement "ensures that the Bankruptcy Code's careful balancing of interests is not undermined by petitioners whose aims are antithetical to the basic purposes of bankruptcy."  Integrated Telecom, 384 F.3 at 119.  Our Court of Appeals concurs with other Circuits that have held the good faith requirement is "indispensable" to the accomplishment of a proper bankruptcy purpose.  Id.   See also Carolin Corp. v. Miller, 886 F.2d 693, 698 (4th Cir. 1989); In re Agricultural Research and Technology Group, Inc., 916 F.2d 528, 535 (9th Cir. 1990).

Accordingly, the fact that appellants met the statutory requirement as bona fide creditors pursuant to 11 U.S.C. § 303(b) was necessary for their involuntary petition.  But we cannot agree that it was sufficient to bar the Bankruptcy Court from dismissing that petition.

Instead, we must determine whether Charles Dawson acted in good faith or bad faith.  The Bankruptcy Code does not define bad faith.  See Gen. Trading Inc. 119 F.3d at 1501.  Rather, "[w]hether the good faith requirement has been satisfied is a fact-intensive inquiry in which the court must examine the totality of facts and circumstances and determine where a petition falls along the spectrum ranging from the clearly acceptable to the patently abusive."  Integrated Telecom, 384 F.3 at 118 (internal quotation marks omitted).  "Proving an involuntary

petition was filed in bad faith requires an inquiry into the creditor's knowledge," a factual question that is reviewed for clear error.  In re Bock Transp., Inc., 327 B.R. 378, 381 (B.A.P. 8th Cir. 2005).

Appellants contend that we should rely on the objective reasonableness of the involuntary petition filing and "the subjective elements of the petitioners['] motivation for the filing." Appellant Br. at 29.  They argue the Bankruptcy Court was wrong to conclude appellants erroneously conflated Charles Dawson's status as a bona fide creditor with his argument that he had not acted in bad faith, id. at 33, restating he did not act in bad faith because he is a judgment creditor.  Id. at 30.  "[T]he two arguments cannot be separated," they contend, because the involuntary filing was the judgment creditors' only means of collecting on their judgment when they suspected Forever Green of dissipating assets or making preference payments.  Id. at 33. They contend the Bankruptcy Court also erred by relying on decisions finding bad faith by creditors without judgments or with questionable claims, or where the debtor was a viable concern -- facts they argue distinguish those bad-faith findings from the matter before us.  Id. at 30-31. Finally, they argue that only an involuntary petition could put a stop to Day's alleged preferential payments.  Reply Br. at 20.

Appellee Forever Green argues that any test for bad faith requires a court to examine whether the petition was put to a "proper use" as defined in the Bankruptcy Code.  Appellee Br. at 26.  In matters involving involuntary petitions, the proper goal is ensuring the orderly ranking of creditors' claims.  Id. (citing Better Care, Ltd., 97 B.R. at 410-11).  Forever Green argues that the record shows Charles Dawson had no bankruptcy purpose when he filed the involuntary petition and sought only to "stop an otherwise lawful arbitration proceeding."  Id. at 31.  The fact

27

that he held a <u>bona</u> <u>fide</u> claim does not insulate him from acting in bad faith.  <u>Id</u>.

As our Court of Appeals explained in <u>In re Myers</u>, 491 F.3d 120, 125 (3d Cir. 2007), "the Bankruptcy Court looks to the totality of the circumstances to determine bad faith, and may consider a wide range of factors, including 'the nature of the debt ...; the timing of the petition; how the debt arose; the debtor's motive in filing the petition; how the debtor's actions affected creditors; the debtor's treatment of creditors both before and after the petition was filed; and whether the debtor has been forthcoming with the bankruptcy court and the creditors.' "  <u>Id</u>.  <u>See also</u> 11 U.S.C. § 1307(c).  These statutory factors apply to the petitioner here, <u>see</u> <u>Tamecki</u>, 229 F.3d at 207 (holding that bad faith turns on "whether the petitioner has abused the provisions, purpose or spirit of bankruptcy law").

The Bankruptcy Court considered a number of statutory factors, including the timing of the petition filing and the nature of the debt.  Specifically, Judge Coleman found that the involuntary petition "was part of Mr. Dawson's larger strategy to exert pressure on Forever Green."  <u>Forever Green</u>, 500 B.R. at 427.  She pointed to his pre-petition actions, including the motion to terminate arbitration "[l]ess than a month after [the Dawsons] obtain[ed] the Consent Judgment," <u>id.</u>  The motion "set forth in detail Forever Green's dire financial situation" and, by forcing the arbitration to abruptly conclude, was "the first indication" that Charles Dawson intended to use the Consent Judgment to interfere with Forever Green's ability to collect in the ProGreen litigation.  <u>Id.</u>  The record shows that when the ProGreen parties filed the motion, Forever Green faced claims exceeding $1,800,000 senior to the Dawsons' Consent Judgment.  An orderly ranking of creditor claims casts doubt on the Dawsons' ability to collect on their judgment.     Nonetheless, as Charles Dawson explained in his deposition, that was his intent in

28

stopping the arbitration proceeding:

[Plaintiffs' attorney:]  At this point, after obtaining the judgment, what was your intention as to
    what to do with it?
[Dawson:]             Get paid.
[Plaintiffs' attorney:]  And how did you propose to get paid?
[Dawson:]             Find any available asset that Forever Green may have and try to use the
    lien to seize it.

. . .

[Plaintiffs' attorney:]  Okay.  And this is generally what you wanted [your attorney] to do, is to
    make the arbitration stop?
[Dawson:]             Of course.
[Plaintiffs' attorney:]  Okay.   And the reason was?
[Dawson:]             I don't believe it has any merit and I'm sick of paying attorneys. I am for
    compromise and no one else is.  That's why.

. . .

[Plaintiffs' attorney:]  Okay.   Were you aware that one of the reasons set forth or that would be
    used to try to terminate this proceeding was the fact that the Dawson judgment now being
    transferred to Pennsylvania would be used to levy on any monies to be paid to the
    arbitrator?
[Dawson:]             I'm going to use that judgment to levy any monies I can find anywhere,
    whether it be the arbitrator or anyone else.  So, yeah, if we can get the lien paid, that's my
    number one objective. If I can get it paid, I'm very happy.

Dawson Depo., 1/5/12 at 181:3-10, 186:17-24, 187:15-188:1.

      The Bankruptcy Court found that Charles Dawson's pre-petition actions "divested

Forever Green of its only means of paying its other, higher-priority claims[,]" which Judge

Coleman deemed "exactly the type of conduct that Chapter 7 proceedings are designed to

prevent."  Forever Green, 500 B.R. at 428.  The record shows Dawson derailed that valid

proceeding by seeking to enforce his Consent Judgment – even as he knew or should have

known, according to the motion to terminate arbitration, that other creditors held claims in excess

of $1.8 million senior to his bona fide claim.  ROA # 13, Ex. 9 at 10.  And, as a 50% member of

the ProGreen entity, Dawson had a material interest in the outcome of the arbitration.  Tr. 1/15/13 at 8:1, 9:6 and 13:22-23.  See also Dawson Depo., 1/5/12 at 93:8-18.

Judge Coleman also considered Charles Dawson's settlement attempt in which his attorney threatened to keep the arbitration in an "indefinite state of suspension. . . [u]nless and until the Dawsons' Judgment for about $300,000.00 is paid off in full[.]"  ROA # 13, Ex. 14 at 1. She concluded that Charles Dawson was "entitled to use any legal means to collect any monies owed to him" but one of those means was not by filing an involuntary petition.  Forever Green, 500 B.R. at 428.  Together with the timing of the involuntary petition itself -- in lieu of a responsive pleading to the Philadelphia action -- and the petitioning creditors' haphazard efforts at service, she found "ample evidence" of an improper purpose in Charles Dawson's involuntary petition.

Judge Coleman's conclusion squares with other courts' findings of bad faith when creditors improperly invoke the Bankruptcy Court's equitable powers.  Courts have held that "debt collection is not a proper purpose of bankruptcy."  Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp., 986 F.2d 709, 716 n.11 (4th Cir. 1993); see, e.g., In re Nordbrock, 772 F.2d 397, 400 (8th Cir. 1985) ("A creditor does not have a special need for bankruptcy relief if it can go to state court to collect a debt").  "The filing of an involuntary petition for a non-bankruptcy purpose is evidence of bad faith."  In re Tichy Elec. Co. Inc., 332 B.R. 364, 373 (Bankr. N.D.Iowa 2005) (citing Basin Elec. Power Co-op. v. Midwest Processing Co, 769 F.2d 483, 486 (8th Cir. 1985)).

Appellants contend that the Bankruptcy Court erred in relying on cases where dismissal resulted from lack of statutory compliance, not bad faith:  "[B]ad faith is not something that

stands on its own [but] must accompany some other issue or 'defect' raised by the putative debtor," they argue.  Reply Br. at 9.

There is no merit to this argument.  A petitioner's good faith is a threshold inquiry into the validity of a bankruptcy filing.  Courts have repeatedly held that the bad faith determination rests on the filer's purpose in invoking the jurisdiction of the Bankruptcy Court.  Our Court of Appeals teaches that a petition is filed in bad faith if it does not serve "a valid bankruptcy purpose" -- here, the orderly ranking of creditor claims -- or is filed "merely to obtain a tactical litigation advantage."  Integrated Telecom, 384 F.3d at 120.  Thus, courts find bad faith exists "where the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization purpose." In re Dami, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994); see also Silverman, 230 B.R. at 52 (finding creditor's involuntary petition an improper use of  "the bankruptcy court as a tool for collection in disregard of" statutory requirements); Atlas Mach. & Iron Works, 986 F.2d at 714 (dismissing involuntary petition because petitioner filed "for the purpose of collecting a debt owed it").  Conformity with statutory requirements is self-evidently insufficient to overcome a factual record replete with evidence of petitioner Dawson's efforts to seek tactical advantage.

Judge Coleman did not abuse her discretion and we affirm her dismissal of the involuntary petition for bad faith.

2.      Whether Joinder Of Additional Creditors May Cure A Defective Petition

Appellants next contend that the Court erred by dismissing the petition when it should have permitted appellants to join other creditors to the petition.  They argue they preserved this

31

issue because the Court did not rule on it. <u>See</u> Reply at 17-18, <u>see also</u> Tr. 2/11/13 at 83:1-7.[11]

Section 303(c) permits a creditor to join an involuntary petition before dismissal or the entry of an order for relief.  Most courts weigh whether the involuntary petition was filed in good faith before permitting additional creditors to join.  Our Court of Appeals has not considered the issue but most Circuits that have done so impose a bad faith exception to joinder under Section 303(c).[12]  <u>See</u>, <u>e.g.</u> <u>Basin Elec. Power Co-op.</u>, 769 F.2d at 485 (other creditors may join as if they had been petitioning creditors if the petition was filed in good faith).  "The three creditor requirement is designed to prevent use of involuntary bankruptcy proceedings by creditors as a means of harassing an honest debtor."  <u>Id.</u> at 487.

As one commentator observed, the "overwhelming majority of courts. . . apply a judicially created bad-faith exception to §303(c). . . .  The rationale is that public policy prohibits entertaining any case commenced upon a petitioner's conduct which amounts to fraud upon the court." 1 <u>Norton Bankruptcy Law and Practice 2d</u>, §21:8 (2007) (footnotes omitted) (cited in <u>Mylotte, David & Fitzpatrick</u>, 2007 WL 2033812 at *8-*9.

More recently, our Bankruptcy Court held that it would join the majority of courts in concluding "a bankruptcy court may dismiss a defective involuntary petition filed by a single creditor in bad faith, even if additional creditors seek to join in the petition, and even if their joinder would meet the three petitioning creditor requirement." <u>Mylotte, David & Fitzpatrick</u>, 2007 WL 2033812 at *8 (citing cases).  In that case, as in <u>Basin Elec. Power Co-op.</u>, a single

---

[11] But see Tr. 2/11/13 at 84:3-9.  Judge Coleman explained to counsel for the petitioning creditors during the February 11, 2013 hearing, "When you find bad faith it's for everybody. . . . [T]hat's the risk people take when they come into involuntary, that it will get dismissed and then they're going to. . . be responsible for the bad faith filing."
[12] The Sixth Circuit and District of Columbia Circuit hew to the minority view that joinder is a matter of right that is not barred under Section 303(c).

creditor filed an involuntary petition despite circumstances that required three creditors to do so. Id. at *4.  The Bankruptcy Court denied other creditors' joinder requests reasoning the creditor knew or should have known the requisite number of creditors.  "The term 'bad faith' is not simply bad judgment but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with design or ill will."  Id. at *11 (quoting In re Claren, Inc., 1992 WL 346779 at *2 (E.D.Pa. Nov. 13, 1992).

Likewise here, the record shows that Charles Dawson's participation in the involuntary petition was in bad faith.  As a 50% member of the ProGreen entity, he had a significant interest in the outcome of the arbitration.  Tr. 1/15/13 at 8:1, 9:6 and 13:22-23.  See also Dawson Depo., 1/5/12 at 93:8-18.  He shut down that valid proceeding by seeking to enforce his Consent Judgment – even as he knew or should have known that other creditors held claims in excess of $1.8 million senior to his bona fide claim, according to the motion to terminate arbitration.  ROA # 13, Ex. 9 at 10.  In his attorney's proposed settlement, Dawson offered to give testimony helpful to Forever Green in its prosecution of a third-party claim if Forever Green paid off the Dawsons' Consent Judgment, and he threatened to keep the arbitration in an "indefinite state of suspension," "[u]nless and until the Dawsons' Judgment for about $300,000.00 is paid off in full[.]"  ROA # 13, Ex. 14 at 1.

These actions, too, support a finding that Charles Dawson's involuntary petition was filed in bad faith.  Adopting the majority rule that bad faith bars joinder of other petitioning creditors, we affirm the Bankruptcy Court's dismissal of the involuntary petition.

3.    Whether The Court Should Have

33

Appointed A Trustee To Oversee Dissolution

Because we affirm the Bankruptcy Court's finding that Charles Dawson filed the

involuntary petition for an improper purpose and that joinder of additional creditors could not

cure a defective involuntary petition, we need not reach appellants' final issue concerning the

appointment of a trustee.   We nevertheless offer the following observations based on the

Bankruptcy Court record.  The record before us is devoid of suggestion that Forever Green made

preference payments to any creditors to the detriment of petitioning creditors.  As stated earlier,

Day testified that he was funding the litigation himself.  He also testified that he used his own

funds to pay off tax liens and certain obligations which he had personally guaranteed.  Further, as

Judge Coleman observed, Forever Green's largest asset by far is its claim against the ProGreen

parties, including Charles Dawson.  The prior arbitration was a valid forum for resolving this

dispute and securing the orderly and fair distribution of assets.  No trustee could do more.

BY THE COURT:

/S/ STEWART DALZELL, J.

34